UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID W. QUALLS, et al., | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 04-2113 (RCL) |
| DONALD RUMSFELD, et al., | ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OPINION AND ORDER

Now before the court is plaintiff David W. Quall's Motion [5] for Preliminary Injunction. For the reasons stated herein, the court denies this motion.

I.   BACKGROUND

Plaintiff David W. Qualls, affiliated with the United States Army from 1986-1994, re-enlisted in the Army National Guard's Try One program on July 7, 2003 for a term of service lasting one year, zero months, and zero days. Soon thereafter, in mid-October of 2003, the Army called Qualls to active duty and extended his term of service, changing his Expiration of Term of Service ("ETS") date from July 6, 2004 to December 24, 2031. The Army form that informed Qualls about his involuntary extension asserts that the extension was legally authorized by 10 U.S.C § 12305, the so-called "stop-loss" statute.

On December 6, 2004, Qualls and seven other servicemen subject to involuntary

1

extensions filed suit in this court against the Secretary of Defense, the Secretary of the Army and the Assistant Secretary of the Army for Manpower and Reserve Affairs ("Army"). Qualls, then on leave in the United States, requested a temporary restraining order directing the Army to allow him to remain in the United States. The court denied this request at a hearing on December 8, 2004. Qualls also moved the court for a preliminary injunction ordering the immediate release of Qualls from active military service. That is the motion now before the court.

II.     LEGAL STANDARD

A preliminary injunction is an "extraordinary" remedy. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). The plaintiff must, by a clear showing, carry the burden of persuasion. Id.; Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). In a motion for preliminary injunction, the plaintiff must demonstrate: 1) a substantial likelihood of success on the merits, 2) that the plaintiff would suffer irreparable injury if an injunction is not granted, 3) that an injunction would not substantially injure another interested party, and 4) that an injunction would favor the public interest. Cobell, 391 F.3d at 258. The court will then "balance the strengths of the [plaintiff's] arguments in each of the four required areas" to determine whether to issue an injunction. CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir.1995). In cases such as this, where it is uncontested that the injunction sought would alter, rather than preserve, the status quo, the moving party must show a clear entitlement to relief or show that extreme or very serious damage will result if the injunction does not issue. Nat'l Conf. On Ministry To Armed Forces v. James, 278 F. Supp. 2d 37, 42 (D.D.C. 2003).

III.     ANALYSIS

   A.     <u>Likelihood of Success</u>

      1.     **Exhaustion of Remedies and Justiciability**

As an initial matter, the Army argues that Qualls is unlikely to succeed on the merits of his case because this court should not reach the merits. The Army suggests that Qualls has failed to exhaust the Army's administrative remedies before initiating this action is federal district court. This Circuit does not require exhaustion if pursuit of an administrative remedy would be futile or if the plaintiff can show irreparable harm. <u>Bois v. Marsh</u>, 801 F.2d 462, 468 (D.C. Cir. 1986). The administrative remedy cited by the Army is set forth in MILPER Message 03-040, which allows "[s]oldiers who have compelling or compassionate reasons" to apply for an exception to the Army's involuntary extension policy. Qualls is not seeking an exception for these reasons, rather he brings a legal challenge to the involuntary extension policy and its application to him in the first instance. The exhaustion the Army demands would be futile. Moreover, as determined in Part III.B of this Memorandum Opinion, Qualls does face irreparable harm. Therefore, the exhaustion requirement does not apply to Qualls.

As to justiciability, the court notes that it would be likely to find Qualls' claim justiciable. Recruiting activities, "by their very nature, involve a crucial intersection of the military and the general public that cannot be left to the sole discretion of the military." <u>Brown v. Dunleavy</u>, 722 F. Supp. 1343, 1349 (E.D. Va. 1989). Further, "this case . . . involves a dispute over the formation and interpretation of a contract, an area that clearly falls within the expertise of the judiciary." <u>Id.</u> (citing <u>Santos v. Franklin</u>, 493 F. Supp. 847 (E.D. Pa. 1980)). "There are few instances that would invite judicial intervention in military affairs to a greater degree than matters

relating to enlistment contracts." Irby v. United States, 245 F. Supp. 2d 792, 799 (E.D. Va. 2003).

## 2.  Contract Claims

To determine whether the military has breached an enlistment contract or whether an enlistment contract is invalid, courts apply general, common law principles of contract law. Cinciarelli v. Carter, 662 F.2d 73, 78 (D.C. Cir. 1981); Woodrick v. Hungerford, 800 F.2d 1413, 1416 (5th Cir. 1986); Pence v. Brown, 627 F.2d 872, 874 (8th Cir. 1980); Castle v. Caldera, 74 F. Supp. 2d 4, 8-9 (D.D.C. 1999) (citing numerous cases); Brown v. Dunleavy, 722 F. Supp. 1343, 1349 (E.D. Va. 1989).[1] Qualls alleges that the Army's extension of his term of service constitutes a breach of contract. Qualls also alleges that the Army's failure to disclose the

---

[1] In opposition to this principle, the Army cites language from Bell v. United States, 366 U.S. 393, 402 (1961), In re Grimley, 137 U.S. 147, 151-152 (1890), and United States v. Larionoff, 431 U.S. 864, 869 (1977). These cases are of no help to the Army.

Grimely holds that enlistment contracts are special because they bring about a change in status, from civilian to solider, just like marriage contracts change the man's status to husband and the woman's status to wife. Such status-changing contracts are special, because, in the enlistment contract context, even if the solider"violate[s] his contract obligations, his status as a soldier is unchanged." Grimley, 137 U.S. at 152 (holding that a soldier who voluntarily served beyond the statutory maximum age could not assert the statute as a reason to end his status as a soldier). However, status-changing contracts are not immune from court challenge. While wrongdoers cannot bring such challenges, " [t]he injured party, and the injured party alone, can obtain relief and a change of status by judicial action." Grimley, 137 U.S. at 152. Here, the plaintiff is the allegedly injured party, and therefore Grimley facilitates plaintiff's suit and does not support the Army's position.

Bell and Larionoff both concern soldiers' entitlement to pay. In Bell, soldiers who demonstrated "utter disloyalty to their comrades and to their country" while in Korean prison camps were still entitled to military pay. 366 U.S. at 394. In Larionoff, soldiers were found to be entitled to re-enlistment bonuses the military had withheld. 431 U.S. at 865. These pay cases carve out a small exception to the general rule that military contracts are interpreted according to common law contract principles. 53 Am. Jur. 2d. Military and Civil Defense § 59 (collecting circuit and district court cases on point). The present dispute between Qualls and the Army has noting to do with Quall's entitlement to pay, and therefore traditional contract law applies.

possibility of involuntary extension constitutes a misrepresentation that invalidates the contract.

      *(a) Terms of the Contract*

The success of Qualls' contract claims hinges in large part on the terms of his enlistment contract. At this point in the litigation, Qualls and the Army apparently dispute what terms make up the enlistment contract. Qualls has proffered a copy of his enlistment contract that had been kept by his local Armory. (Pl. Mot. for Preliminary Injunction, Exh. 3.) According to the Army, this copy of Qualls' contract, unlike the typical contract executed by Try One enlistees, lacks a page titled "C. Partial Statement of Existing United States Laws." The Army insists that Qualls' original contract contains the missing page on the reverse side of the contract's first page. The Army was unable to produce Qualls' original contract before its opposition to the preliminary injunction was due. On the other hand, Qualls has never claimed, either in affidavit or through written argument of counsel, that the copy kept at the armory, which lacks the page, is identical to the original contract that he signed.

The court faces an odd situation. First, the plaintiff seeking relief from an allegedly breached and invalid contract has not provided a copy of that contract that the plaintiff affirms is a true and correct version. Second, the defendant accused of breach and misrepresentation which asserts the presence of certain terms in the original contract has not produced the original version, which it ought to have on file. Thankfully, this odd factual situation does not pose a complex legal problem. When moving the court for a preliminary injunction, plaintiffs bear the burdens of production and persuasion. See Cobell, 391 F.3d at 258. To meet these burdens, Qualls may rely on "evidence that is less complete than in a trial on the merits," Natural Res. Def. Council v. Pena, 147 F.3d 1012, 1022-23 (D.C. Cir. 1998) (quoting Univ. of Texas v.

Camenisch, 451 U.S. 390, 395 (1981)); however, the evidence Qualls does offer must be credible evidence, Sampson v. Murray, 415 U.S. 61, 87 (1974); Serv-Air, Inc. v. Seamans, 473 F.2d 158 (D.C. Cir. 1972).  See generally Societe Comptoir de L'Industrie Cotonniere, Establissements Boussac et al. v. Alexander's Dept. Stores, Inc., 190 F. Supp. 594, 601-02 (S.D.N.Y. 1961) ("As support for a preliminary injunction the court can consider only facts presented by affidavit or testimony and cannot consider facts provable under the modern liberal interpretation of the complaint but which have not been proved.   Indeed, proof to support a preliminary injunction must be strong and clear in view of the restraint put upon the defendant at a time before his liability has actually been adjudged."); Dunn v Stewart,, 235 F. Supp. 955, 964 (S.D. Miss. 1964) ("Statements of counsel during arguments, unsupported by any record evidence, are not evidence and therefore cannot be proof for purposes of issuing temporary restraining order.").

     In Sampson, the Court found a temporary injunction improper when the record "indicates that no witnesses were heard on the issue of irreparable injury, that respondent's complaint was not verified, and that the affidavit she submitted to the District Court did not touch in any way upon considerations relevant to irreparable injury." Id.  The Court was "somewhat puzzled about the basis for the District Court's conclusion that respondent 'may suffer immediate and irreparable injury.'" Id.

     Here, as in Sampson, the court is puzzled by Qualls' failure to offer any statement by way of affidavit, testimony, motion papers for preliminary injunction, or even complaint that the contract featured as his Exhibit 3 is in fact his contract or that he never was presented with the Partial Summary of Existing United States Laws.  Rather than present such important and simple claims on behalf of Qualls, Qualls' attorneys demand that this court take Exhibit 3 to be Qualls'

6

contract because the Army has been unable to produce a different version of the contract within two weeks of getting notice of Qualls' preliminary injunction motion. (Pl. Reply Br. at 1.) There is simply no credible evidence that Exhibit 3 is in fact Qualls' contract.

In addition to the absence of credible evidence that Exhibit 3 is the full contract, there are several reasons to credit the Army when it asserts that Qualls' contract contained the Partial Statement of Existing United States Laws. First, the first page of Qualls' contract appears to be labeled "DD Form 4/1, May 88" and informs the recruit that the form is "[c]ontinued on reverse side." The Army's Exhibit E, the Partial Statement of Existing United States Laws, is labeled "DD Form 4/1 Reverse, MAY 88." The DD form is a standard form, it is likely that Qualls' contract made use of the standard DD form that had terms on the reverse side, and it is likely that whoever copied the file simply forgot or chose not to copy both sides. Second, Qualls has not produced his own copy of his enlistment contract. Enlistment contracts, like offers of employment, leases, and other important contracts, are the kinds of documents people tend to keep, and Qualls' failure to produce his copy, combined with his failure to comment about the contents of the contract he remembers signing, lends further credit to the Army's position.

For these reasons, the court concludes that Qualls has not met his burden of production as regards his claim that the reverse side of form DD 4/1 was missing from Qualls' contract. Therefore, at this stage of the litigation, the court will consider Qualls' claims as if the reverse side of form DD 4/1 were present.

*(b) Breach of Contract*

Having determined that the Partial Statement of Existing United States Laws is part of

Qualls' contract, the court can now turn to Qualls specific contract claims  A plaintiff states a claim for breach of contract by alleging "the existence of a valid and enforceable contract between the plaintiff and defendant, the obligation of defendant thereunder, a violation by the defendant, and damages resulting to plaintiff from the breach." Perry v. Baptist Health, 21 I.E.R. Cas. (BNA) 941 (Ark. 2004); accord Parrish v. Brownlee, 335 F. Supp. 2d 661, 673 (E.D.N.C. 2004).[2]  Here, the parties apparently have a live dispute about what language actually constitutes the enlistment contract between Qualls and the Army.

The question in this case is whether the contract obligates the Army to not involuntarily extend Qualls' term of service beyond the one year for which he enlisted.  Qualls argues that no language provides for the involuntary extension of his one year term of service set forth in that contract.  In response, the Army cites language that it claims would entitle it to extend Qualls' term of service.  The statement of existing laws contains several possibly relevant provisions that the parties have discussed.  First, Paragraph 9(c) tells a recruit that "in the event of war" an enlistment "continues for six months after the war ends." (Def. Br. in Opp., Exh. E., ¶ 10(b).)  Second, paragraph 10(b) tells reservists that if they are:

---

[2]The parties have not briefed the issue of what body of contract law should apply.  In some enlistment contract cases, courts have applied general principles of contract law "rather than the law of any one state, because of the unique relation between the military and those in the armed services, and the need for a consistent interpretation of enlistment contracts." E.g., Brown, 722 F. Supp. at 1349 (citing United States v. Standard Oil Co. of California, 332 U.S. 301, 305-06 (1947).  Other courts have, without discussion, applied the law of the forum. E.g., Castle, 74 F. Supp. at 9.  Whether applying general principles of contract law, the law of Arkansas (the state in which the contract was formed), or the law of the District of Columbia (the forum of this litigation), the contract law in this case is routine and the outcome would be the same regardless of the court's choice of law.  Therefore, the Court does not speak on the choice of law question.

> a member of a Reserve Component of an Armed Force at the beginning of a period of war or national emergency declared by Congress, or if [they] become a member during that period, [their] military service may be extended without [their] consent until six (6) months after the end of that period of war.

Id. ¶ 10(b). Finally, paragraph 10(d)(1) provides that "in times of national emergency declared by the President," a member of the Ready Reserve "may be ordered to active duty . . . for not more than 24 consecutive months." Id. ¶ 10(d)(1).

The Army argues that the last mentioned provision, paragraph 10(d)(1), notifies Qualls of the possibility of involuntary extension. It is true that the prerequisites exist for the application of paragraph 10(d)(1): due to the September 11 attacks, a state of national emergency has existed throughout Qualls' enlistment, see Presidential Proclamation 7463, 66 Fed. Reg. 48,199 (2001); 67 Fed. Reg. 58,317 (2002); 68 Fed. Reg. 53,665 (2003); 69 Fed. Reg. 55,313 (2004), and Qualls has been a member of the Ready Reserve. However, paragraph 10(d)(1), unlike the other provisions described above, says nothing about extension, only activation. While the paragraph clearly notifies the recruit that the Army could call a reservist to active duty – and the Army did call Qualls to active duty – it does not permit the Army to unilaterally extend an enlistment without consent in order to make possible further service on active duty.³ Compare 10(d)(1),

---

³This is the same problem with the other provision the Army cites. Paragraph 11, from the three-page "Statement of Understanding of Reserve Obligation and Responsibilities," which both parties agree is in the contract Qualls signed, reads:
> During the entire period of this enlistment . . . I may at any time be ordered to active duty involuntarily . . . in the event of a war or national emergency . . . or under any other condition authorized by law in effect at the time of my enlistment or which may hereinafter be enacted into law.

(Pl. Mot. for Preliminary Injunction, Exh. 3., ¶ 11.) Like paragraph 10(d)(1), this provision merely tells recruits that they may be activated during "the entire period of this enlistment" and mentions nothing of extension, voluntary or involuntary. Qualls enlistment contract specifies a term of service of one year, zero months, and zero days and paragraph 11 would not give the Army the right to require a day of service beyond that term.

with 10(d)(2) (stating that under certain circumstances, a reservist may be "required to perform active duty . . . without . . . consent" and that the reservist's "enlistment may be extended so [the reservist] can complete 24 months of active duty."). Further, the Partial Statement of Existing United States Laws, including paragraph 10(d)(1), is a standard list of terms that appears in both Try One contracts and contracts for enlistments over 24 months, see, e.g., (Def. Opp. to TRO, Exh. D.) (Qualls' 1986 eight-year enlistment contract). This demonstrates that the "not more than 24 consecutive months" provision in paragraph 10(d)(1) operates not as an extension mechanism but as a limit on the period of active duty an enlistee can be required to serve during enlistment.

On the other hand, the conditions necessary to trigger an involuntary extension pursuant to the first provision, paragraph 9(c), and the second provision, paragraph 10(b), were met at the time Qualls enlisted, July 7, 2003, and when the Army extended his term of service, mid-October of 2003. Both paragraphs require the existence of war. On September 18, 2001, Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Authorization for Use of Miliary Force, 107 Pub. L. 40, § 2(a), 115 Stat. 224 (2001); see Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2635 (2004). Shortly thereafter, the President sent United States military forces to Afghanistan to "subdue al Qaeda and quell the Taliban regime that was known to support it." Hamdi, 124 S. Ct. at 2635. As late as June 28, 2004, some eight months after Qualls had been involuntarily extended, the Supreme Court noted

that active combat operations against the Taliban continued in Afghanistan.[4]  In addition, "in October 2002, Congress passed the Authorization for Use of Military Force Against Iraq Resolution of 2002 (the "October Resolution"), Pub L. No. 107-243, 116 Stat. 1498." Doe v. Bush, 323 F.3d 133, 134 (1st Cir. 2003).  The United States Congress, by its authorization statutes, has initiated  war in the same way it has initiated war since World War II.  Qualls' argument that Congress has not declared war is made without legal argument or factual basis; the facts suggest that the United States is at war at the behest of Congress.  Even if Qualls were somehow right that the United States Congress has not declared a war, paragraph 9(c) makes no mention of declared wars but only speaks of a "state of war."  Therefore, paragraph 9(c) alone would allow the Army to involuntarily extend Qualls' enlistment whether or not the United States was in a formally declared war.[5]

---

[4]In its Hamdi decision, the Supreme Court cited the following materials as evidence of the continuing hostilities pursuant to the September 18 Congressional authorization:

> Constable, U. S. Launches New Operation in Afghanistan, Washington Post, Mar. 14, 2004, p A22 (reporting that 13,500 United States troops remain in Afghanistan, including several thousand new arrivals); J. Abizaid, Dept. of Defense, Gen. Abizaid Central Command Operations Update Briefing, Apr. 30, 2004, http://www.defenselink.mil/transcripts/2004/tr20040430-1402.html (as visited June 8, 2004, and available in the Clerk of Court's case file) (media briefing describing ongoing operations in Afghanistan involving 20,000 United States troops).

Hamdi, 124 S. Ct. at 2641-42.

[5]Qualls argues that even paragraph 9(c) only permits involuntary extension during officially declared wars.  Qualls asserts that paragraph 9(c) explains the law codified at 10 U.S.C. § 506 and he cites a single use of the word "declared" in the 1967 legislative history of that section. (Pl. Motion for Preliminary Injunction at 5 n.1.) (citing 1967 U.S.C.C.A.N. 2635, 2636).  First, the court finds the old legislative history cited to be too unclear to establish Congress' intent that the statute apply only to formally declared wars.   Second, and more to the point, the statute is not relevant to Qualls' contract claim.  Qualls himself has told this court to apply traditional contract principles while interpreting enlistment contracts.  The court has held Qualls

Therefore, either paragraph 9(c) or paragraph 10(b)[6] give the Army the right to extend Qualls' enlistment. Nowhere in the enlistment contract does the Army forfeit its right to involuntarily extend enlistees pursuant to United States laws. Therefore, Qualls has no likelihood of success on the merits of a breach of contract claim.

### (c) Fraud and Misrepresentation

Recision of an enlistment contract is proper if the recruit was induced to enter into the contract by fraud or false representations. Brown, 722 F. Supp. at 1350; Withum v. O'Connor, 506 F. Supp. 1374, 1378 (D.P.R. 1981) (citing Chalfant v. Laird, 420 F.2d 945, 945 (9th Cir. 1969)). This is so even if the misrepresentations were innocently or non-negligently made. Withum, 506 F. Supp. at 1378. The elements of fraudulent misrepresentation are: (1) a false representation or non-disclosure of material facts, (2) made with knowledge of its falsity, (3) with an intent to induce reliance, and (4) reasonable reliance on that representation. Barrer v. Women's Nat'l Bank, 761 F.2d 752, 758 (D.C. Cir. 1985); Nader v. Allegheny Airlines, Inc., 626 F.2d 1031, 1036 (D.C. Cir. 1980); see also Restatement (Second) of Contracts §§ 161, 164.

Qualls alleges that the his enlistment contract failed to disclose that the Army could involuntary extend Qualls' term of service. As already discussed, the contract, with its statement

---

is correct, and so the court looks at the language of 9(c), which makes no mention of declared war, and concludes that the Army need not show that Congress officially declared war to involuntary extend enlistees.

[6]Though not raised by the parties, paragraph 10(d)(2)(c) provides that a member of the Ready Reserve is "required to perform active duty . . . without . . . consent," (Def. Br. in Opp., Exh. E ¶ 10(d).),and that the reservist's "enlistment may be extended so [the reservist] can complete 24 months of active duty," id. ¶ 10(d)(2), if the reservist has not served on active duty for a total 24 months. The court, uninformed on what this provision means, notes this provision without expressing any opinion as to whether it would permit an involuntary extension or not.

of United States laws, does indeed put Qualls on notice that the Army might involuntarily extend his term of service.  Qualls also alleges that the Army falsely represents its Try One program as a one year trial program after which a recruit can decide to reenlist or leave when in fact, Try One enlistees can have their terms of service involuntary extended.  As evidence of the representations that the Army makes, Qualls has submitted Army recruiting materials from the Army National Guard's Internet website.  One webpage states that Try One "allows a veteran to serve for only one year on a trial basis before committing to a full enlistment;" another webpage describes the Try One program under the heading of "Trial Programs."  Exhibit 2.

Qualls, however, has offered no evidence of his own reliance on the Army's representations, or, for that matter, his own reliance on the Army's alleged omissions.  The webpage printouts that Qualls submitted with his motion for preliminary injunction were printed on November 22, 2004, which is months after Qualls signed up for Try One.  Qualls never affirms that he viewed let alone relied on similar recruitment material or representations from Army recruitment personnel.[7]  Qualls offers no evidence that " false or fraudulent inducements, representations, promises, or guarantees . . . prompted or caused [him] to sign his contract of enlistment."  Chalfant, 420 F.2d at 945 (quoting the district court's findings).  As discussed above, Qualls must produce the credible evidence essential to making a clear showing of that he is likely to succeed on his claim.  Again, Qualls has not done so.

---

[7]In fact, counsel for Qualls argues that the recruiting materials are targeted at "prospective recruits like Qualls." (Reply Br. at 6 (emphasis added).  Even in the brief, there is no mention of Qualls' personal reliance.

### 3. Due Process Claims

In addition to his contract claims, Qualls alleges that the Army, by failing to notify him of its involuntary extension policies, deprived him of due process. Assuming for the moment that involuntary extension is a deprivation of liberty, as Qualls argues, due process would require some type of notice before that constitutional deprivation took place, Zinermon v. Burch, 494 U.S. 113, 127(1990) (citing Goss v. Lopez, 419 U.S. 565, 579 (1975)). For enlistees, notice of military personnel practices and procedures is given in their enlistment contracts. Parrish v. Brownlee, 335 F. Supp. 2d 661, 671-72 (finding that "the terms of plaintiff's contract and Army regulations and statutes provided plaintiff with sufficient notice that he would continue to be treated as a commissioned officer" who could be called up to active duty. As already discussed in relation to Qualls' misrepresentation claim, the contract, through the Partial Statement of Existing United States Laws, notified Qualls of possible involuntary extension during periods of war and for various other reasons. Moreover, the Army's decision to extend Qualls was not arbitrary or capricious, because Qualls was treated like similarly situated enlistees subject to the standard terms of the enlistment contract and statutes that permit involuntary extension, 10 U.S.C. §§ 506, 12302, 12305; the Qualls due process claim has no likelihood of success because the Army in fact gave Qualls the notice that was due.

### 4. Conclusion

For all these reason, the court finds Qualls has no chance of success on the merits given the lack of evidence before the court.

B.      Irreparable Harm

Mr. Qualls is currently serving on active duty in Iraq. He, like other military personnel in Iraq, puts his life on the line every day and faces a great risk of harm and death as a result of his continuing service. Qualls would be forced to remain in harms way and would be irreparably injured should an injunction not issue. This is irreparable harm. See Parrish v. Brownlee, 335 F. Supp. 2d 661, 668 (E.D.N.C. 2004) ("[A]ssuming for purposes of the irreparable harm analysis that plaintiff's arguments are meritorious and that the call to active duty is unjustified, a loss of liberty and companionship of family in such circumstances is significant and irreparable. Accordingly, if the injunction is improperly denied, there is a strong probability of irreparable harm to plaintiff pending trial and final judgment.").

The Army argues that Qualls's delay in seeking relief – from October of 2003 when he learned of his extension until December of 2004 when he filed suit – militates against a finding of irreparable harm. Such a delay may count against a plaintiff in the court's harm analysis. See, e.g., Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30, 44 (D.D.C. 2000). In this case, Qualls' delay does not date from October of 2003, but from July 7, 2004, the first date of his involuntary extension. Doe v. Rumsfeld, Civ. No. 04-2080, 2004 U.S. Dist. LEXIS 23338 (E.D. Cal. Nov. 5, 2004) (finding no harm when soldier's voluntary service was still running). The five month delay indicates that Qualls, during those months, was not concerned enough about his about safety to file suit.

Nevertheless, the court finds that, on balance, the delay is of less importance given Qualls' location overseas in Iraq and the significant life and liberty interests at stake. This factor weighs in favor of granting a preliminary injunction.

15

### C.     Harm to the Military

Should Qualls prevail on his motion for preliminary injunction, the court would order the Army to discharge Qualls. The harm to the Army associated with one such an order, which would concern one individual, is likely minimal, see Parrish, 335 F. Supp. 2d at 668; Irby v. United States, 245 F. Supp. 2d 792, 797-98 (E.D. Va. 2003), though perhaps difficult to precisely calculate given the difficulty of putting a value on the efforts of one soldier, see Decl. of Kieth Klemmer, ¶ 3 ("Like all soldiers here, [Qualls] is an important member of our team and he is needed back here as soon as possible."). Even if the harm is minimal as regards one soldier, more than one soldier is likely to be affected should a preliminary injunction issue. An injunction ordering Qualls' discharge on the evidence presented – on his standard Try One enlistment contract and his involuntary extension – would open the door to similarly situated Try One enlistees seeking identical relief. In evaluating the harm to the Army, the court must consider the aggregate harm of all these possible claims, "looking at the total effect of such cases." Irby, 245 F. Supp. 2d at 797; see also Guerra v. Scruggs, 942 F.2d 270, 275 (4th Cir. 1991); Parish, 335 F. Supp. 2d at 669. In the aggregate, the harm to the Army, though "somewhat removed and abstract," is nonetheless real in that it "present[s] the possibility of substantial disruption and diversion of military resources." Id.; see Guerra, 942 F.2d at 275; Irby, 245 F. Supp. 2d at 797-98. Qualls has therefore failed to show that issuing an injunction would not substantially harm the Army.

### D.     Public Interest

The public interest can be hard to ascertain. In this case, there are competing interests

16

that can be said to be public interests.

On the one hand, the public has an interest "particularly in light of current events, in seeing that the Army's discretionary decision making with respect to personnel decisions is effectuated with minimal judicial interference." Parish, 335 F. Supp. 2d at 675 (quoting Irby, 245 F. Supp.2d at 798).

On the other hand, this case involves the integrity of the Army recruitment and enlistment process, and an injunction ordering Qualls' discharge, assuming his claims were legally sound, would show to the public that Army is not above the law and that truth and disclosure in recruiting is important. See Novak v. Rumsfeld, 423 F. Supp. 971, 972 (N.D. Cal. 1976) ("Without this candid appraisal of the benefits as well as the burdens, the Navy cannot expect to foster credibility among prospective recruits. Without candid disclosure and a commitment to follow through on recruitment promises, a volunteer Navy cannot function. Above all other contracting parties the Government must be held to its promises."); Brown, 722 F. Supp. at 1353 ("The integrity of the recruiting process in today's all volunteer peacetime Navy compels rescission of [the] enlistment contract."). Of course, it is hoped the Army would strive for the utmost candor regardless of whether this court issues an injunction.

What is clear, however, is that Qualls' presently has no likelihood of success on the merits of his claim in this case, and "where plaintiff's claims lack merit, it is not in the public interest for this court to restrain the Army from carrying out its duty under law and executive order." Id. It is in the public interest to deny injunctive relief when the relief is not likely deserved under law.

    E.    <u>Balancing</u>

Qualls has not shown a likelihood of success on the merits. While he has demonstrated irreparable harm, he has not shown that the Army would not also suffer harm. The public interest, given that Qualls has no likelihood of success on the merits, militates against granting an injunction. For these reasons, and additionally because Qualls seeks a mandatory injunction, the court finds that, on balance, the factors weigh against granting a preliminary injunction.

IV.    CONCLUSION AND ORDER

For the foregoing reasons, it is hereby ORDERED that Qualls's motion for a preliminary injunction is DENIED.

Signed by Royce C. Lamberth, United States District Judge, February 7, 2005.